IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

BRUCE E. RILEY,                    *
                                   *
        Plaintiff,                 *
                                   *
vs.                                *    Civil Action No.08-00029-B
                                   *
MICHAEL J. ASTRUE,                 *
Commissioner of Social             *
Security,                          *
                                   *
        Defendant.                 *

## ORDER

Plaintiff Bruce E. Riley ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for a period of disability and disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 et seq. On September 26, 2008, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 17). Thus, this case was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636( c) and Fed.R.Civ.P. 73. (Doc. 18). The parties waived oral argument. (Docs. 22, 23). Upon consideration of the administrative record and memoranda of the parties, it is **ORDERED** that the decision of the Commissioner be **AFFIRMED.**

## I. __Procedural History__

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on February 2, 2004. (Tr. 60, 61-63). He alleges that he has been disabled since January 1, 2004[1] due to severe depression, panic attacks, hepatitis C, anxiety, memory loss and weakness. (Tr. 98-99, 588). Plaintiff's application was denied at the initial stage. (Tr. 37-38). He filed a timely Request for Hearing before an Administrative Law Judge ("ALJ"). (Tr. 44). On January 23, 2006, ALJ Glay E. Maggard ("ALJ Maggard") held an administrative hearing, which was attended by Plaintiff, his representative and a vocational expert. (Tr. 584-604). On July 26, 2006, ALJ Maggard issued an unfavorable decision wherein he found that Plaintiff is not disabled. (Tr. 21-32). Plaintiff's request for review was denied by the Appeals Council ("AC") on December 14, 2007. (Tr. 4-6). Thus, the ALJ's decision became the final decision of the Commissioner in accordance with 20 C.F.R. § 404.981. __Id.__ The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

------

[1]Plaintiff initially alleged disability beginning October 18, 2001, but amended his disability onset date during the hearing to January 1, 2004. (Tr. 588).

2

## II.  **Background Facts**

Plaintiff was born on February 28, 1955 and was 50 years old at the time of the administrative hearing.  (Tr. 92, 589). Plaintiff has a high school education and two years of college. (Tr. 89, 104, 590) and past relevant work ("PRW") as a marine electrical salesman. (Tr. 95, 591). At the administrative hearing held on January 23, 2006, Plaintiff testified that he weighs 205, but his normal weight is 245.  He attributes his weight loss to his treatment and his depression.  (Tr. 589).  He further testified that he was diagnosed with Hepatitis C four or five years before, and was treated with Interferon and then with Pegintron, but was "let go" while he was undergoing treatment. (Tr. 591-592).  He stated that he had physical and mental problems that would not allow him to even sign on to his computer or to think.  (Tr. 592). Plaintiff further testified that he suffers from depression, and that he is being treated at the VA. (Tr. 593).  According to Plaintiff, he takes medication that knocks him out and "keeps him down."  He further testified that he uses marijuana four or five times a month, and that his doctor told him he cannot give him other headache medication because he uses marijuana.  (Tr. 597).

## III. **Issue on Appeal**

A.  Whether the ALJ erred by improperly evaluating medical evidence in finding that Plaintiff's substance abuse was a contributing factor material to a finding of disability.

3

B.    Whether the ALJ erred by failing to properly assess the VE testimony, who stated that there were no jobs Plaintiff could perform, based on the consultative psychiatrist's opinion , which the ALJ assigned determinative weight.

## IV.  <u>Analysis</u>

### A.  <u>Standard of Review</u>

In reviewing claims brought under the Act, this Court's role is a limited one.  This Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence, and 2) whether the correct legal standards were applied. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]").  In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the

Commissioner's decision.  <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. Dɪsт. Lᴇxɪs 10163 (S.D. Ala. 1999).

**B.   Discussion**

An individual who applies for Social Security disability benefits must prove her disability.  20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).  The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability. 20 C.F.R. §§ 404.1520, 416.920.[2]  <u>See</u>, <u>e.g.</u>, <u>Crayton v. Callahan</u>,

---

[2]The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work.  <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history.  <u>Id</u>. at 1005.  Once a claimant

120 F.3d 1217, 1219 (11th Cir. 1997).

In his decision, the ALJ found that Plaintiff has not engaged in work activity since his alleged onset date. (Tr. 26). The ALJ also found that Plaintiff has the severe combination of impairments of generalized anxiety disorder with panic attacks, marijuana abuse, opioid dependence by history, polysubstance abuse of cocaine and other stimulants, sedatives and hallucinogens by history, and adjustment disorder with depressed mood. According to the ALJ, Plaintiff's generalized anxiety disorder with depressed mood, major depression and adjustment disorder with depressed mood meet the criteria of 12.04( c) of 12 C.F.R. Part 404, Subpart P, Appendix 1. ("Listing 12.04")(Tr. 27). The ALJ further found that if Plaintiff discontinued his substance abuse, he would not have an impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P. Appendix 1. (Tr. 30). The ALJ found that if Plaintiff discontinued his substance abuse, he would have the residual functional capacity

---

meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

("RFC") to perform unskilled to semi-skilled work at all levels of exertion.  Id.  The ALJ also found that if Plaintiff discontinued his substance abuse, he would still be unable to perform his past relevant work.  (Tr. 31).  He found that considering Plaintiff's age, education work experience and RFC, if Plaintiff discontinued his substance use, there would be a significant number of jobs in the national economy he could perform.  Id.  The ALJ concluded that Plaintiff would not be disabled if he stopped the substance abuse, and as a result, his substance abuse disorder is a contributing factor material to the determination of disability.  Accordingly, the ALJ concluded that Plaintiff is "not disabled." (Tr. 32).

Records from the VA show that Plaintiff was prescribed various medication during the course on his treatment including vitamin B complex/vitamin C, Venlafaxine[3], Clonazepam[4], Promethazine[5], Quetiapine Fumarate[6], Alprazolam[7], vitamin E, Simvastatin[8],

_____

[3]Venlafaxine is used to treat depression.  See www.drugs.com (Last visited January 22, 2009).

[4]Clonazepam is used to treat seizure disorder or panic disorder.  See www.drugs.com (Last visited January 22, 2009).

[5]Promethazine is used to treat allergy symptoms. See www.drugs.com (Last visited January 22, 2009).

[6]Quetiapine Fumarate is used to treat schizophrenia. See www.drugs.com (Last visited January 22, 2009).

[7] Alprazolam is used to treat anxiety and panic disorder. See www.drugs.com (Last visited January 22, 2009).

[8]Simvastatin is used to treat high cholesterol.  See www.drugs.com (Last visited January 22, 2009).

Ketoconazole[9], Triamcinolone Acetonide[10], Codeine[11]/acetaminophen, Butalbital[12] and Cyclobenzaprine[13]. (Tr. 203, 220-222, 521-522, 566-567, 573-579).

The relevant evidence of record includes treatment records from the Department of Veteran's Administration Clinic. ("VA"). The notes reflect that Plaintiff was treated by VA psychiatrist Randal Caffarel, M.D., on June 9, 2003. Dr. Caffarel notes that Plaintiff's history includes major depressive disorder, single episode, insomnia and Hepatitis C. On mental status exam, Dr. Caffarel observed that Plaintiff was pleasant and cooperative, alert and oriented to person, time, place and situation. Plaintiff's speech was normal, he was calm, and his mood was good. His thought process was logical and goal directed, he had no suicidal or homicidal ideation, no anxiety, no obsessions, compulsions, hallucinations or illusions.  His intelligence was

---

[9] Ketoconazole is used to treat infection caused by fungus. See www.drugs.com (Last visited January 22, 2009).

[10] Triamcinolone Acetonide is a metered dose inhaler containing steriodal anti-inflammatory medication.  See www.drugs.com (Last visited January 22, 2009).

[11]Codeine is a narcotic pain medicine for mild to moderate pain.  See www.drugs.com (Last visited January 27, 2009).

[12]Butalbital is a non-narcotic pain reliever. . See www.drugs.com (Last visited January 27, 2009).

[13]Cyclobenzaprine is a muscle relaxant used to treat painful muscle conditions.  See www.drugs.com (Last visited January 22, 2009).

average, his insight and judgment were fair and he was grossly
intact with the interview.  Dr. Caffarel diagnosed Plaintiff with
major depression, single episode in remission,  and Hepatitis C,
and assigned him a GAF of 70[14].  (Tr. 338-340).

On July 15, 2003 Social Worker Rosalind B. Flagg, MSW, LCSW,
observed that Plaintiff was doing relatively well, and he denied
depression and suicidal or homicidal ideation, and also denied any
alcohol and drug use.  Plaintiff was alert, oriented, cooperative
and pleasant.  He had logical and goal directed thoughts, good
mood, appropriate affect and normal speech.  (Tr. 335).

Plaintiff was seen by Marrieth G. Rubio, M.D., stated on July
25, 2003, August 22, 2003 and October 3, 2003.  Dr. Rubio opined
that Plaintiff had stable depression, improved lymphopenia after
Neupogen treatment, stable anemia, and stable leucopenia.  (Tr.
327, 329, 332-333).

Social Worker John Trippe noted on October 22, 2003 that
Plaintiff called to report that his anxiety level had increased,
and reported periods of depression that hit him suddenly.

---

[14]Global Assessment of Functioning is for reporting the
clinician's judgment of the individual's overall level of
functioning and carrying out activities of daily living. This
information is useful in planning treatment and measuring its
impact, and in predicting outcome. A score of 61-70 indicates
some mild symptoms or some difficulty in social occupational, or
school functioning, but generally one functioning pretty well and
has some meaningful interpersonal relationships. See,
www.psyweb.com.  (Last visited May 14, 2009).

Plaintiff was diagnosed with depression, and assigned a GAF of 70. (Tr. 325-326).

Plaintiff was seen by Mohammad Anas Alkghatib, M.D., on October 23, 2003. Plaintiff reported experiencing recent bizarre behavior, in which he felt like he was going crazy and was sweating, was dizzy and had difficulty breathing. On mental status exam, Dr. Alkghatib noted that Plaintiff was cooperative, alert and was oriented to time, place and situation. His speech was normal, he had no abnormal motor movement, and he was anxious and goal directed. Plaintiff had no suicidal or homicidal ideation, no obsessions, compulsions, hallucinations, illusions, or delusions. Plaintiff had panic attacks, average intelligence and fair insight and judgment. Plaintiff was diagnosed with generalized anxiety disorder and panic disorder without agoraphobia, and was assigned a GAF of 45[15]. (Tr. 322-324).

Plaintiff was seen by Dr. Caffarel on October 29, 2003. Plaintiff reported that he just got off Interferon for Hepatitis C treatment. He reported an increase of panic attacks and anticipatory anxiety, and headaches. On mental status exam, Dr. Caffarel noted that Plaintiff was pleasant and cooperative, and was alert and oriented to person, time, place and situation.

---

[15]A GAF of 41-50 indicates severe symptoms or any serious impairment in social, occupational or school functioning. See, www.psyweb.com. (Last visited May 14, 2009).

Plaintiff's speech was normal, he was moderately psychomotor agitated, and he was tired, anxious and fidgety. His thought process was logical and goal directed, and he had no suicidal or homicidal ideation, and no obsessions, compulsions, hallucinations or illusions. Plaintiff was moderately anxious. His intelligence was average, his insight and judgment were fair and he was grossly intact with the interview. Dr. Caffarel diagnosed Plaintiff with panic disorder without agoraphobia, and Hepatitis C, and assigned him a GAF of 45. (Tr. 320-322).

On October 31, 2003, Dr. Rubio noted that Plaintiff tolerated the infergen/Ribavirin treatment well, but that the "qualitative came back positive." Dr. Rubio indicated that Plaintiff's chances to respond to additional treatment are minimized by his panic attacks and stress. (Tr. 319).

Plaintiff was admitted to Mobile Infirmary on November 2, 2003, after overdosing on Tylenol #3 and Xanax. Plaintiff stated that he accidentally took too many pills, but that he had had a great deal of depression and stress related to a legal issue and a failed response to two years of interferon therapy. A drug screen was positive for cannabinoids, opiates and Benzodiazepines. Plaintiff was diagnosed with major depression, recurrent, severe; depression secondary to Hepatitis and treatment with interferon; adjustment disorder with depressed mood and mixed disturbance of conduct and emotions; polysubstance abuse by history; recent

cannabis abuse; chronic hepatitis C; and status post overdose suicide attempt. He was treated overnight and released with instructions to follow up with his psychiatrist. (Tr. 151-163).

Plaintiff was seen by Dr. Caffarel on November 3, 2003. Plaintiff reported that he was told that his Hepatitis C treatment had failed, that the news got to him, and as a result, he took over 2200 mg of codeine, 50 mg of Xanax some Klonopin and washed it down with alcohol. This lead to him being treated at Mobile Infirmary. On mental status exam, Dr. Caffarel observed that Plaintiff was pleasant and cooperative, and was alert and oriented to person, time, place and situation. Plaintiff's speech was normal, he was mildly psychomotor agitated, and he was anxious. His thought process was logical and goal directed, he had no suicidal or homicidal ideation, and no obsessions, compulsions, hallucinations or illusions. He had no anxiety. His intelligence was average, his insight and judgment were fair and he was grossly intact with the interview. Dr. Caffarel diagnosed Plaintiff with panic disorder without agoraphobia, adjustment disorder with disturbance of mood and conduct, resolved, and Hepatitis C, and assigned him a GAF of 50. (Tr. 316-318).

Plaintiff was next seen by Dr. Caffarel on November 13, 2003. Plaintiff reported that he was still having suicidal thoughts from time to time, but he was able to get them out of his head and was becoming less suicidal as time goes by. On mental status exam, Dr.

Caffarel observed that Plaintiff was pleasant and cooperative, and was alert and oriented to person, time, place and situation. Plaintiff's speech was normal, and his affect/mood was anxious/"flat." His thought process was logical and goal directed, he had no suicidal or homicidal ideation, and no obsessions, compulsions, hallucinations or illusions. He had moderately severe anxiety. His intelligence was average, his insight and judgment were fair and he was grossly intact with the interview. Dr. Caffarel diagnosed Plaintiff with panic disorder without agoraphobia and recurrent moderate major depression, and assigned him a GAF of 50. (Tr. 312-314).

Plaintiff was seen by Social Worker Mr. Trippi on November 19, 2003. Plaintiff reported that he was taking his medications and thought he was doing better; however, he still had problems sleeping at night. Mr. Trippi opined that Plaintiff might be able to return to work in January of 2004, diagnosed Plaintiff with panic disorder, and assigned him a GAF of 50. (Tr. 311).

During a November 26, 2003 visit, Plaintiff reported to Dr. Caffarel that he been taking his medications as prescribed without side effects and with better results. According to Plaintiff, he was having good days and bad days, and his sleep, appetite, energy level and anxiety were better; however, he was experiencing panic attacks one to three times a day. Dr. Caffarel diagnosed Plaintiff with panic disorder without agoraphobia and recurrent moderate

major depression, and assigned him a GAF of 50.   (Tr. 309-310).

Plaintiff, on January 16, 2004, reported to Clinical Specialist Danette Overstreet, APRN, BC, that he had run out of Xanax[16] seven days before, and had used Clonazepam in an effort to make up the difference.   Plaintiff indicated that while he was prescribed 1 ½ Xanax per day, he felt he needed 3 mg a day. Plaintiff was advised, per Dr. Caffarel, that his overuse of Xanax was unacceptable, and that the Xanax would be discontinued if he did not take it within the prescribed boundaries.   On mental status exam, Ms. Overstreet observed that Plaintiff was pleasant, cooperative and talkative, and alert and oriented to person, time, place and situation. Plaintiff's speech was regular rate and rhythm, his psychomotor was normal, his affect was blunted and mood was concerned.   Plaintiff's thought process was coherent and goal directed, he had no suicidal or homicidal ideation, and no obsessions, compulsions, hallucinations or illusions.   He had moderate anxiety.   Plaintiff's intelligence was within normal limits, and he was grossly intact with the interview.   Ms. Overstreet diagnosed Plaintiff with recurrent moderate major depression and generalized anxiety disorder, and assigned him a GAF of 50.   (Tr. 306-308).

Social Worker Mr. Trippi noted, on January 22, 2004, that

---

[16]Xanax is a benzodiazepine, used to treat anxiety disorder. See www.drugs.com (Last visited January 29, 2009).

Plaintiff reported taking his medications and felt that he was doing better. Plaintiff stated that he did not believe he could work because of his emotional state. Mr. Trippi diagnosed Plaintiff with major depression, and assigned him a GAF of 50. (Tr. 305).

In a letter dated February 3, 2004, Dr. Caffarel opined that Plaintiff was unable to perform jury duty due to his mental problems. (Tr. 305).

Plaintiff was seen by Clinical Specialist Ms. Overstreet on February 28, 2004. Plaintiff reported that his anxiety level was out of control, and that he wanted more Xanax. On mental status exam, Plaintiff was pleasant, cooperative and talkative and alert and was oriented to person, time, place and situation. Plaintiff's speech had regular rate and rhythm, his psychomotor was normal, his affect was blunted and his mood was concerned. His thought process was coherent and goal directed, he had no suicidal or homicidal ideation, and no obsessions, compulsions, hallucinations or illusions. He had moderate anxiety. His intelligence was within normal limits, and he was grossly intact with the interview. Ms. Overstreet diagnosed Plaintiff with recurrent moderate major depression generalized anxiety disorder, and assigned him a GAF of 50. (Tr. 302-304).

In treatment notes dated March 1, 2004, Khaldoun Bakleh, M.D., on mental status exam, observed that Plaintiff was cooperative, and

alert and oriented times three.  Plaintiff's affect was anxious, yet reactive and his mood was low.  He was preoccupied with his anxiety.  His thought process was coherent and goal directed, he had no suicidal or homicidal ideation, and no obsessions, compulsions, hallucinations or illusions.  He had moderate anxiety. His insight was intact, his judgment was fair, and he was grossly intact with the interview.  Dr. Bakleh diagnosed Plaintiff with generalized anxiety disorder and secondary depression, and assigned him a GAF of 50.  (Tr. 299-301).   In treatment notes dated March 11, 2004, Dr. Bakleh states that Plaintiff reported a good response with Seroquel to control his panic attacks.  Dr. Bakleh diagnosed Plaintiff with generalized anxiety disorder and secondary depression.  (Tr. 217-219).

A VA Rating Decision dated March 19, 2004 granted Plaintiff VA benefits commencing on March 1, 2004, based on his generalized anxiety disorder with panic attacks and hepatitis C.  (Tr. 81, 503-507).

Social Worker Lucille Pace noted on March 22, 2004 that Plaintiff reported that he was taking his medications and that they were effective.  Plaintiff also reported that he was independent in his activities of daily living, that he was sleeping well, prepared his meals, and lived alone.  Plaintiff denied using street drugs and other substances, and reported that he has Hepatitis C. (Tr. 216-217)

In a nurse visit on March 29, 2004, Plaintiff reported continued headaches, weight gain on Seroquel, and continued panic attacks and anxiety. (Tr. 216). A screening for post traumatic stress disorder on March 29, 2004 was negative. (Tr. 214-215).

Physician's assistant Theodore F. Ramsey reported on March 29, 2004 that Plaintiff's physical exam showed he was alert and oriented times three in no apparent distress. His mental status was within normal limits. Plaintiff tested positive for cannabinoids and benzodiazepine, and asked for Hydrocodone. He was diagnosed with tension headache. (Tr. 210-213).

Plaintiff was seen by Dr. Caffarel on April 12, 2004. Plaintiff reported that he had been taking his medications as prescribed without side effects and with good results. Plaintiff also reported that he no longer wanted to kill himself, and that he was not having as many panic attacks as before. He reported better sleep and good appetite. Dr. Caffarel diagnosed Plaintiff with panic disorder with agoraphobia, generated anxiety disorder and recurrent moderate major depression, and assigned him a GAF of 50. (Tr. 207-209).

Dr. Caffarel treated Plaintiff on May 26, 2004. On mental status exam, Plaintiff was pleasant and cooperative, and alert and oriented to person, time, place and situation. Plaintiff's speech was normal, he was calm, his affect was anxious and his mood was nervous. His thought process was logical and goal directed, he had

17

occasional suicidal ideation and no homicidal ideation, and no obsessions, compulsions, hallucinations or illusions. He was occasionally paranoid, and he had moderate anxiety. His intelligence was average, his insight and judgment were fair and he was grossly intact with the interview. Dr. Caffarel diagnosed Plaintiff with panic disorder, major depression with psychotic features, psychosis and generalized anxiety disorder, and assigned him a GAF of 50. (Tr. 204-206).

In nursing triage notes dated June 21, 2004, Carol J. Wadibia noted that Plaintiff had sought treatment for a headache, and became very angry and agitated because they would not give him narcotics due to a positive drug screen. Plaintiff admitted smoking marijuana, and requested hydrocodone. (Tr. 202-204). Plaintiff was also seen by Dr. Schultz on June 21, 2004. Plaintiff complained that phenergan was not helping his severe headaches. Plaintiff reported his marijuana use and opined that hydrocodone was helping his headache. (Tr. 202).

Social Worker Ms. Pace noted on June 21, 2004 that Plaintiff reported that he was taking his medications and that they were fairly effective, except they were not helping his severe headaches. Plaintiff was alert and oriented, had logical, goal directed thought processes, angry mood, anxious affect, and fair judgment and insight. Plaintiff admitted smoking marijuana occasionally, and reported that he has severe headaches. (Tr. 200-

201).

Plaintiff was treated by Dr. Caffarel on July 14, 2004. Plaintiff complained of headaches, and indicated that the pain clinic would not treat him unless he was free of marijuana use. Plaintiff reported that his psychiatric medication was helping, that his panic attacks were less frequent and that he was depressed and irritable.  He further noted that smoking marijuana seemed to help his headaches.  (Tr. 568).

On examination, Dr. Caffarel observed that Plaintiff's affect/mood was anxious and irritable and his thought processes were logical and goal-directed.  He ranted vaguely about hurting someone but had no plans and no intentions. Plaintiff also reported feeling paranoid and seeing things out of the corner of his eye. Dr. Caffarel diagnosed Plaintiff with severe major depression with psychotic features, and panic disorder, assigning him a GAF of 50. (Tr. 567-569).

Plaintiff presented to the VA Preventive Health Clinic on July 30, 2004 for follow-up treatment for Hepatitis C.  Plaintiff reported chronic headaches with pain at 7 on the pain scale. Plaintiff further reported smoking a pack of cigarettes a day, not drinking at all, and that marijuana helped with his headaches and appetite.  His physical exam was normal except for 4mm bilateral pupil dilation.  Chere Fulmer, M.D., listed assessments as Hepatitis C, previous suicide attempt with overdose of Lortab, but

19

no reported current suicide ideation, and substance abuse. (Tr. 562-565).

Plaintiff was treated by Dr. Caffarel on November 9, 2004. Plaintiff denied any side effects from his medication and reported mixed results. Plaintiff also complained of headaches, and stated that he had been suicidal the previous week. Dr. Caffarel noted that Plaintiff had some flight of ideas, and that he was a "little suicidal." On exam, Dr. Cafferel noted that Plaintiff was pleasant and cooperative, alert and oriented to person, time, place and situation, his speech was normal in rate and volume, he was mildly agitated with anxious and somewhat depressed mood. Dr. Cafferel diagnosed Plaintiff with panic disorder, recurrent major depression and psychosis. (Tr. 558-560).

Plaintiff returned to the VA Preventive Health Clinic on January 26, 2005, complaining of headache, with an eight on the pain scale. His physical exam was normal, and it was noted that he had  persistently positive urine drug screens. An earlier drug test in 2005 was positive for benzo and marijuana. Plaintiff was diagnosed with moderate major recurrent depressive disorder, chronic headache, panic disorder without agoraphobia, neutropenia and insomnia. (Tr. 554-557).

VA neurologist William F. Seit, Jr., M.D., conducted a consultative exam on March 3, 2005. Dr. Schultz stated that marijuana probably did not relieve Plaintiff's headaches, which may

be caused by panic attacks.  He noted that Plaintiff initially appeared anxious and pressured, but his exam was otherwise normal. Dr. Schultz listed his impressions as tension headaches, uncontrolled Hepatitis C, generalized anxiety disorder and substance abuse.  Plaintiff reported that he had given up marijuana two days before.  (Tr. 552-554).  Plaintiff underwent a CT scan of his head on March 3, 2005, which showed no intracranial abnormalities.  (Tr. 571).

In a treatment note dated May 17, 2005, Hasan H. Rahman, M.D., noted that Plaintiff was compliant with medication, with good results, and was reporting that he was doing well, that his sleep and appetite were okay and that his self esteem was fair.  Dr. Rahman observed that  Plaintiff was pleasant and cooperative, and alert and oriented times three.  His speech was normal, he was a little anxious, and his thought process was logical and goal directed.  Dr. Rahman diagnosed Plaintiff with panic disorder, recurrent moderate major depression and psychosis, with a GAF of 50.  (Tr. 547-551).

Plaintiff returned to the VA Preventive Health Clinic on June 20, 2005 with no complaints.  The notes reflect that Plaintiff was last treated for Hepatitis C a year before and that he had had no complaints since then.  His physical exam was normal, and he had a positive screening for post traumatic stress disorder .  (Tr. 544-547).

Office notes from Dr. Caffarel dated October 18, 2005 reflect that Plaintiff was taking medication as prescribed without side effects but with poor results. Dr. Caffarel noted that Plaintiff was shaking, and appeared to be very nervous. Plaintiff reported that he was still using marijuana and that his interest, self esteem, energy level, concentration and appetite were not good, and that he was having panic attacks and stomach problems. Dr. Caffarel noted that Plaintiff had been through four or five substance abuse treatments, that Plaintiff identified his problem as "lack of dope," and that he opined he could function if he had dope. (Tr. 541). Dr. Caffarel diagnosed Plaintiff with recurrent severe major depression with psychotic features, polysubstance dependence and panic disorder with agoraphobia, and assigned him a GAF of 41. (Tr. 524, 541-542).

Plaintiff was referred to Scott Statham, Addiction Therapist, on October 18, 2005. Plaintiff reported that he was using Hydromorphone/Dilaudid IV several times a day, and that he sometimes received methadon from a friend. At one point, Plaintiff threatened to commit suicide, then stated that he did so to see if Mr. Statham would offer him narcotics. Plaintiff eventually agreed to enter treatment. Mr. Statham advised Plaintiff to go to the emergency room with his withdrawal symptoms, but Plaintiff declined. Mr. Statham opined that Plaintiff had resources he was not reporting. (Tr. 539). Plaintiff did not show up for his

November 7, 2005 addiction therapy appointment.  (Tr. 538).

Dr. Caffarel's notes reflect that Plaintiff presented for an unscheduled appointment on December 20, 2005, that he was very anxious and shaking and that he reported that he had only used pot lately.  On mental exam, Plaintiff was shaky and nervous, and alert and oriented to person, time, place and situation.  His mood was anxious, nervous and panicky, and his thought process was logical and goal directed.  Plaintiff was diagnosed with opioid-type dependence, combination of drug dependence excluding opioid type drug, severe, recurrent depressive affective disorder, with psychotic behavior, and panic disorder without agoraphobia.  He was assigned a GAF of 41.  (Tr. 523, 534-536).

Plaintiff requested to see substance abuse counselor Mr. Statham immediately following his visit with Dr. Caffarel.  (Tr. 537).  Plaintiff advised Mr. Statham that during their last session, he had about his near daily use of opiates, and that he was only using marijuana.  Mr. Statham observed that Plaintiff's mood seemed mildly depressed with congruent affect, that he denied suicidal and homicidal ideation, that he was not a danger to himself or others, and that he demonstrated good insight into his situation.  Mr. Statham opined that Plaintiff was drug-seeking and was trying to manipulate to obtain any kind of narcotic.  (Tr. 533).

Plaintiff also attended a relapse prevention group therapy

23

session on December 20, 2005.  He reported IV shooting opiates for
many years, and on that day, and that he was still using drugs
after several treatments.  He was assigned a GAF of 45.  (Tr.
532A).

Ellen N. Eno, Ph.D. reviewed Plaintiff's medical records and
prepared a Mental Residual Functional Capacity Assessment dated
March 30, 2004.  Dr. Eno opined that Plaintiff is moderately
limited in his ability to understand and remember detailed
instructions, to carry out detailed instructions, to maintain
attention and concentration for extended periods and to interact
appropriately with the general public.   She further opined that
Plaintiff is not significantly limited in any other category of
Understanding and Memory, Sustained Concentration and Persistence,
Social Interaction or Adaptation.  According to Dr. Eno, Plaintiff
can understand, remember and carry out short and simple
instructions for at least two hour periods without special
supervision and within a traditional work environment, and he
should have minimal contact with the general public.  (Tr. 164-
165).

Dr. Eno also completed a Psychiatric Review Technique on March
30, 2004, in which she diagnosed Plaintiff with general anxiety
disorder and panic attacks, and opined that he is moderately
restricted in his ability to maintain social functioning and
maintain concentration, persistence or pace, and is mildly

24

restricted if his activities of daily living. She noted that
Plaintiff's memory difficulties appear to be related to his
medication. (Tr. 166-180).

Carol M. Davis, SDM, completed a Physical Residual Functional
Capacity Assessment on April 28, 2004, in which she opined that
Plaintiff can lift 50 pounds occasionally and 25 pounds frequently,
and can sit, stand or walk for about six hours in an eight-hour
workday. She further opined that Plaintiff is unlimited in his
ability to push or pull with hand or foot controls. Ms. Davis
further limited Plaintiff to never climbing ladders, ropes or
scaffolds, and climbing ramps or stairs only occasionally.
According to Ms. Davis, Plaintiff has no manipulative, visual or
communicative limitations, and has no environmental limitations
other than to avoid concentrated exposure to hazards. (Tr. 181-
188).

C.E. Smith, M.D., evaluated Plaintiff at the request of the
Agency on September 30, 2005. On physical exam, Dr. Smith noted no
thinking disorder and no hallucinations, and that Plaintiff showed
a good range of appropriate affect and that his cognitive testing
was better than he expected. Dr. Smith diagnosed Plaintiff with
marijuana abuse, obioid dependence by history, polysubstance abuse
of cocaine, other stimulants, sedatives and hallucinogens, by
history, adjustment disorder with depressed mood, relating to
medical condition. Dr. Smith concluded that Plaintiff may be

25

slowed down by his medications, but that he understood, remembered and carried out even complex instructions, and appeared capable of managing his own finances. (Tr. 497-499).

In a Medical Source Opinion Form (Mental) completed on October 1, 2005, Dr. Smith opined that Plaintiff is moderately limited in his ability to respond appropriately to supervisors, co-workers, and customers or other members of the general public, or to deal with changes in a routine work setting. He further opined that Plaintiff is moderately limited in his ability to maintain attention, concentration or pace for periods of at least two hours, to maintain social functioning and to maintain activities of daily living. According to Dr. Smith, Plaintiff is mildly limited in his ability to use judgment in detailed or complex work-related decisions or to understand, remember and carry out detailed or complex instructions, and has no limitations on his ability to use judgment, or to understand, remember and carry out simple, one and two-step instructions. Dr. Smith stated that there would be a change in Plaintiff's limitations if he stopped drug use, and that his abuse of marijuana and treatment with benzodiazepine may negatively impact his functioning. (Tr. 500-501).

In a Medical Source Statement of Ability to Do Work-Related Activities (Mental) dated February 1, 2006, clinical psychologist John D. Davis, Ph.D. opined that Plaintiff is moderately limited in his ability to understand and remember short, simple instructions

and to carry out detailed instructions.  He opined that Plaintiff is slightly limited in his ability to understand and remember detailed instructions and to make judgments on simple work-related decisions.  He noted that the medical records are full of references to Plaintiff's polysubstance abuse and his continued marijuana use.  He opined that Plaintiff's functioning could improve significantly if he were totally abstinent from alcohol and/or substance use/abuse.  (Tr. 581-582).

In a letter dated May 10, 2006, Sandra E. Smith, RN, MSN-CANP noted that Plaintiff was to began treatment for Hepatitis C, and that he would receive daily injections of Infergen and would take 1200mg of Ribavirin daily for approximately 11 months, during which time he would have numerous follow-ups to monitor side effects. She also noted that Plaintiff might develop anemias, and would be monitored for vision and depression.  (Tr. 583).

### 1. Whether the ALJ erred in finding that Plaintiff's substance abuse was a contributing factor material to a finding of disability.

Plaintiff argues that the ALJ erred in determining that Plaintiff's substance abuse was a contributing factor material to a finding of disability.  Plaintiff further argues that the ALJ erroneously relied upon Dr. Smith's opinion to support his conclusion that Plaintiff would not be disabled if he stopped using illegal drugs.  According to Plaintiff, Dr. Smith's statement that

27

Plaintiff's abuse of marijuana and treatment with benzodiazepines "may" have an impact on his functioning is equivocal, and implies that it is not probable, but rather possible.

Defendant argues that Plaintiff has the burden of proving that his drug addiction is not a contributing factor material to his disability determination, and has failed to do so.  He argues that Plaintiff does not dispute his ongoing cannabis use, and that both Dr. Smith and Dr. Davis[17] concluded that Plaintiff's functioning would improve if he discontinued use.  Defendant further argues that the ALJ correctly relied on the opinions of Drs. Smith and Eno in making two decisions, as required, by determining first that Plaintiff's substance abuse was material to his finding that Plaintiff was disabled, and then by determining that Plaintiff would not be disabled absent his substance abuse.

The Contract with America Advancement Act of 1996 ("CAAA"), 42 U.S.C. § 432(d)(2)©, amended the SSA to preclude an award of benefits when alcoholism or drug addiction is determined to be a contributing factor material to the determination that a claimant is disabled.  See, e.g., Deters v. Commissioner of Social Security, 301 Fed. Appx. 886 (11th Cir. 2008)(per curiam); Doughty v. Apfel, 245 F.3d 1274, 1275 (11th Cir. 2001); Mand v. Apfel, 2001 WL 267457,

---

[17]Defendant's references to the opinion of Dr. Day actually refer to the opinion of psychiatrist John W. Davis, Ph.D.  (Tr. 3, 581-582).

*4 (M.D. Fla. 2001); <u>Tucker v. Apfel</u>, 2000 WL 548178, *1 (S.D. Ala.
Apr. 12, 2000); <u>Englert v. Apfel</u>, 1999 WL 1289472, *8-13 (M.D. Fla.
Jun. 16, 1999).  Specifically, the CAAA provides that a claimant
"shall not be considered to be disabled for purposes of this
subchapter if alcoholism or drug addiction would (but for this
subparagraph) be a contributing factor material to the
Commissioner's determination that the individual is disabled."
<u>Doughty</u>, 245 F.3d at 1279.  The regulations implementing the CAAA,
namely 20 C.F.R. § 404.1535 and 20 C.F.R. § 416.935, provide that
once the Commissioner determines that a claimant is disabled and
finds medical evidence of drug addiction or alcoholism, there must
then be a determination of whether the drug addiction or alcoholism
is a contributing factor material to the determination of
disability.   <u>Id</u>.   "The key factor" in this "materiality
determination," is "whether the claimant would still be found
disabled if he stopped using drugs or alcohol."  <u>Id</u>. (citing to 20
C.F.R. § 404.1535(b)(1)).

     In his opinion, the ALJ made the following findings:

     4.  The severity of the claimant's Generalized Anxiety
     Disorder with Depressed Mood, Major Depression and
     Adjustment Disorder with depressed mood meets the
     criteria of section 12.04( c) of 20 CFR Part 404, Subpart
     P. Appendix 1.  (20 CFR 404.1520(d) and 416.920(d))


     . . . .


     5.  If the claimant stopped the substance use, the

29

claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P. Appendix 1 (20 CFR 404.1520(d)).

The undersigned notes that the claimant has continuously used illegal drugs throughout the relevant period of disability considered herein, i.e., from January 1, 2004 through present (Exhibit 11F). The claimant has admitted to shooting opiates, regularly smoking marijuana and taking more than the prescribed amount of prescription drugs. In addition, he overdosed on one occasion after taking more than the prescribed amount of Xanax medication. The undersigned therefore, reviewed the claimant's treatment records prior to his time of alleged disability, i.e., in May and June of 2003 (Exhibit 6F at 147-153), and notes that the treatment notes did not indicate that the claimant was using illegal drugs during this time. The claimant, in fact, had reported during this time that he was not using illegal drugs. He was looking forward to ending Hepatitis C treatment and was doing relatively well. Treating physicians opined that the claimant had a global Assessment of Functioning (GAF) Score of 70. A GAF score of 70 is indicative of an individual with some mild symptoms or some mild difficulty in social, occupational, or school functioning; however, is generally functioning pretty well. The undersigned finds that the record reflects that the claimant's functioning improves dramatically once he abstains from the use of illegal drugs. If the claimant ceased using illegal drugs, his impairments would cause him to experience only mild limitations and would not rise to listing level. His impairments would not cause him to experience such a marginal adjustment that he would regularly decompensate. The undersigned finds support for this assessment in the opinion submitted by Dr. Smith who opined that the claimant's marijuana abuse may have a negative impact on his functioning. The undersigned finds that Ms. Eno's assessment as to the claimant's functioning would best reflect the claimant's functioning if he abstained from illegal drug usage.

6. If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform unskilled to semi-skilled work at all levels of

exertion.

. . . .

In reaching the above residual functional capacity, the undersigned has considered all evidence relating to how the claimant would function if the substance use was stopped.   The record reflects that the claimant's functioning improved when he abstained from illegal drug usage.   As an aside, the undersigned notes that the claimant relayed on October 15, 2005, to treating personnel that if he had dope he could function.

(Tr. 27, 30, 31).

The ALJ correctly determined that Plaintiff is disabled, and that the medical evidence indicates that his drug addiction is a contributing factor material to his disability.   The medical records for the June/July 2003 time period, which precedes Plaintiff's alleged disability onset date, demonstrate that Plaintiff reported good mood, sleep, self esteem and interest, that he was functioning relatively well, and was assigned a GAF of 70, indicating mild functional limitations. (Tr. 335, 338-340)  During a July 15, 2003 doctor's visit, Plaintiff denied the use of alcohol or drugs, and the record is devoid of any evidence that suggests that Plaintiff was using drugs during this time frame.  (Tr. 335).

By late October/November 2003, Plaintiff's condition began to deteriorate and he was hospitalized on November 3, 2003 due to a drug overdose, and was assigned a GAF of 50. (Tr. 316-318)  The treatment records for that period and thereafter contain repeated

31

references to Plaintiff's drug use.  Plaintiff tested positive for marijuana, cannabinoids and benzodiazepine, and freely admitted that he was using marijuana and opiates and intended to continue to use them for the rest of his life. (Tr. 497-498, 532A, 538, 541).

Relying on Plaintiff's treatment records, and the opinions of the medical experts, the ALJ correctly determined that Plaintiff would retain the residual functional capacity to perform unskilled to semi-skilled work at all levels of exertion if he discontinued illegal drug use.  In preparing her Mental Residual Functional Capacity Assessment dated March 30, 2004, Dr. Eno specifically omitted Plaintiff's substance abuse disorder in her assessment. Her conclusions were reached considering only Plaintiff's affective disorder and anxiety-related disorders.  (Tr. 166).  According to Dr. Eno, whose opinion the ALJ found best reflects Plaintiff's functioning if he abstained from illegal drug usage, there was insufficient evidence in the record to support a finding of episodes of decompensation.  Dr. Eno opined that Plaintiff has moderate limitations in his ability to maintain social functioning and to maintain concentration, persistence and pace, and mild limitations in his ability to perform activities of daily living. (Tr. 176).

Dr. Eno's findings are consistent with the findings of Dr. Smith, who opined that while Plaintiff experiences a number of moderate limitations in his ability to function, if his drug use

stopped, there would be a change in those limitations, such that "Plaintiff's abuse of marijuana and treatment with benzodiazepines may have a negative impact on his functioning." (Tr. 500-501). Further support for the ALJ's finding and Dr. Eno's opinion is found in the opinion of Dr. Davis. Dr. Davis observed that the record is full of references to Plaintiff's polysubstance abuse and continued marijuana use, and that Plaintiff's functional limitations could improve significantly absent his polysubstance abuse and marijuana use. (Tr. 581-582). Substantial evidence supports the ALJ's finding that Plaintiff is disabled, and that his drug addiction is a contributing factor material to that disability.

> **2.   Whether the ALJ erred by failing to properly assess the vocational expert's testimony that Plaintiff could not perform any jobs based on the consultative psychiatrist's opinion.**

Plaintiff asserts that the ALJ erred in finding that he could perform other work, and in not properly assessing the vocational expert's testimony that there were no jobs Plaintiff could perform. According to Plaintiff, the ALJ's opinion is "internally inconsistent" in that he first assigns significant weight to the opinion of Dr. Smith and less weight to the opinion of Dr. Eno, and then assigns determinative weight to the opinion of Dr. Eno.

Defendant counters that the ALJ correctly relied on Dr. Smith's opinion in determining as an initial matter, whether

Plaintiff was disabled as Dr. Smith's opinion considered all of Plaintiff's impairments, including his substance abuse.  Defendant further asserts that the ALJ properly relied on Dr. Eno's opinion when considering Plaintiff's limitations, without considering those attributable to his substance abuse, because Dr. Eno's opinion specifically excludes consideration of Plaintiff's substance abuse.

In <u>Brueggemann v. Barnhart</u>, 348 F.3d 689, 693-695 (8th Cir. 2003), the Eighth Circuit explained that the regulations require the ALJ to first determine whether the claimant is disabled, using the standard five-step approach detailed in 20 C.F.R. § 404.1520, "without segregating out any effects that might be due to substance use disorders."  <u>Id</u>. at 694.  In other words, the ALJ must base this initial disability determination on substantial evidence of medical limitations "without deductions for the assumed effects of use disorders."  <u>Id</u>.  "The inquiry here concerns strictly symptoms, not causes[]" such that "if the gross total of a claimant's limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of substance use disorders are absent."  <u>Id</u>. at 694-695.

In this case, the ALJ used the standard five-step approach based strictly on Plaintiff's symptoms, and determined that the severity of his impairments meets Listing 12.04, 20 CFR Part 404,

Subpart P, Appendix 1[18].  Having made that determination, the ALJ then correctly considered whether Plaintiff's drug addiction is a contributing factor material to his disability, such that he would not be found disabled if he stopped using drugs or alcohol.  The ALJ correctly relied upon the opinion of Dr. Smith, at step three of the inquiry, to determine that Plaintiff is disabled when the limitations stemming from his substance abuse are taken into account.  The ALJ was likewise correct in finding, at step five of the inquiry, that Plaintiff is not disabled, when Plaintiff's limitations stemming from his substance abuse are disregarded, as represented by the opinion of Dr. Eno.  The ALJ did not err in relying upon the opinions of Dr. Smith and Dr. Eno, and the testimony of the vocational expert in concluding that Plaintiff is not disabled, as his decision is supported by substantial evidence.

**V.    Conclusion**

For the reasons set forth, and upon consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for period of disability and disability insurance benefits, is due to be **AFFIRMED.**

---

[18]In the five-step process, a determination that a Plaintiff meets a listing results in a finding of disability.  12 CFR 404.1520(a)(4)(iii), 12 CFR 404.920(a)(4)(iii).

**DONE** this the **13th**  day of **May, 2009.**

                                   **/s/ SONJA F. BIVIN**
                                **UNITED STATES MAGISTRATE JUDGE**